# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

**ECREDIT SOLUTIONS LLC,**

       **Plaintiff,**

    **v.**

**VYZE, INC.,**

       **Defendant.**

**CASE NO. 6:20-cv-00304-ADA**

**JURY TRIAL DEMANDED**

## DEFENDANT VYZE, INC.'S RULE 12(b)(6)
## <u>MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM</u>

## <u>TABLE OF CONTENTS</u>

Page(s)

I.    THIS CASE IS UNLIKE *SLYCE V. SYTE*.....................................................................1

II.   NATURE AND STAGE OF PROCEEDINGS............................................................1

III.  SUMMARY OF ARGUMENT....................................................................................2

IV.   STATEMENT OF THE FACTS..................................................................................3

V.    ARGUMENT ..............................................................................................................5

      A.    This Case Should Be Dismissed Under Rule 12(b)(6)......................................5

      B.    The Law of 35 U.S.C. § 101. ..........................................................................6

      C.    The Patent-in-Suit Is Invalid Under 35 U.S.C. § 101. .....................................7

            1.    Claim 1 of the '353 Patent is not patent eligible. ................................8

            2.    The dependent claims of the '353 Patent are not patent eligible.................17

            3.    There are no claim construction or factual disputes preventing the
                Court from ruling on this issue at the Rule 12 stage..................................19

VI.   CONCLUSION ..........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aeritas, LLC v. Sonic Corp.*,
No. 6:20-cv-00103-ADA (Mar. 13, 2020) ............................................................................... 1

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
109 F. Supp. 3d 916 (W.D. Tex. 2015), aff'd, 838 F.3d 1253 (Fed. Cir. 2016) ................. 6, 12

*Affinity Labs of Texas, LLC v. DirecTV, LLC*,
838 F.3d 1253 (Fed. Cir. 2016) ........................................................................................... 7, 12

*Alice Corp. Pty. v. CLS Bank Int'l*,
573 U.S. 208 (2014) ........................................................................................................... *passim*

*Ancora Techs., Inc. v. HTC Am., Inc.*,
908 F.3d 1343 (Fed. Cir. 2018) ................................................................................................ 13

*Apple, Inc. v. Ameranth, Inc.*,
842 F.3d 1229 (Fed. Cir. 2016) ................................................................................................ 13

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ..................................................................................................................... 6

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*,
687 F.3d 1266 (Fed. Cir. 2012) .................................................................................................. 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................................................................... 6

*Berkheimer v. HP Inc.*,
881 F.3d 1360 (Fed. Cir. 2018) .......................................................................................... 19, 20

*Bilski v. Kappos*,
561 U.S. 593 (2010) ........................................................................................................... *passim*

*Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*,
955 F.3d 971 (Fed. Cir. 2020) .................................................................................... 10, 11, 15, 18

*buySAFE, Inc. v. Google, Inc.*,
765 F.3d 1350 (Fed. Cir. 2014) ................................................................................................ 16

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
880 F.3d 1356 (Fed. Cir. 2018) .......................................................................................... 13, 14

*Credit Acceptance Corp. v. Westlake Services*,
    859 F.3d 1044 (Fed. Cir. 2017)............................................................................ *passim*

*Dealertrack, Inc. v. Huber*,
    674 F.3d 1315 (Fed. Cir. 2012)..................................................................................18

*Diamond v. Chakrabarty*,
    447 U.S. 303 (1980)......................................................................................................6

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)...........................................................................17, 18

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)..................................................................................14

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)....................................................................................8

*Finnavations LLC v. Payoneer, Inc.*,
    No. 1:18-cv-00444-RGA, 2019 WL 1236358 (D. Del. Mar. 18, 2019) ....................1

*Intellectual Ventures I LLC v. Capital One Fin. Corp.*,
    850 F.3d 1332 (Fed. Cir. 2017)..................................................................................19

*Inventor Holdings, LLC v. Bed Bath & Beyond Inc.*,
    123 F. Supp. 3d 557 (D. Del. 2015), *aff'd*, 643 F. App'x 1014 (Fed. Cir. 2016)..............11, 15

*Mayo Collaborative Servs. v. Prometheus Labs., Inc.*,
    566 U.S. 66 (2012)......................................................................................................17

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016)....................................................................................7

*SAP Am., Inc. v. InvestPic, LLC*,
    898 F.3d 1161 (Fed. Cir. 2018).......................................................................8, 13, 14

*Solutran, Inc. v. Elavon, Inc.*,
    931 F.3d 1161 (Fed. Cir. 2019), cert. denied, No. 19-1017, 2020 WL 1325880
    (U.S. Mar. 23, 2020) ..............................................................................11, 15, 16, 18

*In re TLI Commc'ns LLC Patent Litig.*,
    823 F.3d 607 (Fed. Cir. 2016)....................................................................................16

*Ultramercial, Inc. v. Hulu, LLC*,
    772 F.3d 709 (Fed. Cir. 2014) (Mayer, J., concurring)..............................................6

**Statutes**

35 U.S.C. § 101 ......................................................................................................... *passim*

**Other Authorities**

FED. R. CIV. P. RULE 12 ................................................................................1, 3, 5, 8, 19

## I.     THIS CASE IS UNLIKE *SLYCE V. SYTE*

Defendant Vyze, Inc. is aware of this Court's opinion in *Slyce v. Syte* and its approach that, in most cases, "delaying the determination of a patent's § 101 eligibility is the wisest course of action." No. 6:19-cv-257-ADA, 2020 WL 278481, at *8 (W.D. Tex. Jan. 10, 2020). This case, however, "is one of the rare cases where it is appropriate to resolve the Section 101 eligibility of the patent[]-in-suit as a Rule 12(b) motion to dismiss." *See, e.g.*, *Aeritas, LLC v. Sonic Corp.*, No. 6:20-cv-00103-ADA (Mar. 13, 2020) (text order denying Defendants' motions to dismiss without prejudice). Indeed, the assertion of a patent directed to a similar abstract idea was sufficient grounds for Judge Andrews of the District of Delaware to find a case exceptional and award attorneys' fees because patents directed to fundamental business practices (and nothing more), like the patent invalidated in *Alice*, are clearly ineligible:

> There is no question that the '755 Patent is patent ineligible under the Federal Circuit's current precedent. In fact, the Patent is reminiscent of patents which courts were invalidating in the immediate wake of *Alice,* five years ago. Since *Alice,* the law of patent eligibility has perhaps become unpredictable and unclear on the fringes. ***But one thing has remained true: patents which look like* Alice *are ineligible.***

*Finnavations LLC v. Payoneer, Inc.*, No. 1:18-cv-00444-RGA, 2019 WL 1236358, at *2 (D. Del. Mar. 18, 2019) (emphasis added). The patent here, which is directed to making lending decisions based on creditworthiness, looks like *Alice* and the other patents invalidated by federal courts since *Alice*, including *Credit Acceptance Corp. v. Westlake Services*, 859 F.3d 1044 (Fed. Cir. 2017). It is therefore clearly ineligible and presents the kind of ineligibility question that this Court can and should address at the Rule 12 stage.

## II.     NATURE AND STAGE OF PROCEEDINGS

On April 22, 2020, eCredit Solutions Licensing LLC filed this lawsuit accusing Vyze, Inc. of infringing at least Claim 1 of the U.S. Patent No. 8,788,353. The '353 Patent is entitled, "System

and method for presenting a financing instrument at a point of sale." eCredit Solutions alleges that Vyze's "Consumer Financing Solution . . . enables customers . . . to make purchases from registered merchants such as online e-commerce websites and/or brick-and-mortar locations" through "instant financing for the purchases from one of the hosted financial institution/companies." (Dkt. No. 1-3, at 2.)

## III.   SUMMARY OF ARGUMENT

Making lending decisions based on creditworthiness and risk factors "is a fundamental economic practice long prevalent in our system of commerce." *Alice Corp. Pty. v. CLS Bank Int'l*, 573 U.S. 208, 219 (2014). The claims of the '353 Patent, which eCredit Solutions asserts in this case, are directed to this abstract idea and do not claim any inventive concept. The Supreme Court held this type of fundamental economic practice invalid as a matter of law under 35 U.S.C. § 101 in *Alice*, *id.* (regarding "the concept of intermediated settlement"), and in *Bilski v. Kappos*, 561 U.S. 593, 611 (2010) (regarding the "basic concept of hedging"), because the mere addition of computer elements does not confer eligibility on claims directed to an otherwise ineligible abstract idea. *See Alice*, 573 U.S. at 226–27.

Like the patents found invalid in *Credit Acceptance Corp. v. Westlake Services*, 859 F.3d 1044 (Fed. Cir. 2017), the '353 Patent claims no more than performing ordinary steps in the financing process like "obtaining financial information about a customer from a user, combining these two sources of information to create a financing package for each of the inventoried items, and presenting the financing packages to the user." *Credit Acceptance*, 859 F.3d at 1045; *see also id.* at 1056 ("We have found particularly that data processing to facilitate financing is a patent-ineligible abstract concept."). The '353 Patent simply claims the desired result of extending credit based on financial data, but does not cover any concrete method of implementing such idea nor solve any specific technical problems identified in the prior art systems.

2

Therefore, Vyze requests the Court to grant its motion to dismiss eCredit Solutions' claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## IV.   STATEMENT OF THE FACTS

The '353 Patent issued on July 22, 2014, and is entitled "System and method for presenting a financing instrument at a point of sale." (Dkt. No. 1, ¶¶ 6–7.) The '353 Patent is generally directed to "presenting a financial instrument to a purchaser-borrower at a POS [point-of-sale], determining the credit worthiness of the purchaser-borrower, granting or denying the extension of credit, executing all documents, and the processing of the purchaser-borrower's initial and all subsequent installment payments." ('353 Patent at 1:26-31.)

The applicant admitted that "financing instruments" were "typical," and that point-of-sale terminals were conventionally used to process a customer's purchase of goods and services from a merchant seller. (*Id.* at 1:7–48.) According to the applicant, however, "[o]ne option that [was] not available at the POS [was] the creation of a financing instrument that establishes a purchaser's obligation to pay for goods and/or services in installments while providing a merchant payment in full." (*Id.* at 1:38–41.) As a result, the applicant stated that "[t]ypically, such financing instruments, if available at all, are separately negotiated." (*Id.* at 1:41–42.) The applicant identified various disadvantages to separately negotiating financing instruments, including that the merchant must wait to receive full payment, or that the merchant receives less than full payment. (*Id.* at 1:43–48.) The applicant's concern was thus to "present[] a financial instrument to a purchaser-borrower at a POS, determin[e] the credit worthiness of the purchaser-borrower, and grant[] or deny[] the extension of credit." (*Id.* at 1:52–55.) That is, the applicant sought simply to provide financing to a customer.

Claim 1—the '353 Patent's only independent claim and the only claim asserted in eCredit Solutions' Complaint—is representative of the claims:

3

1. A method for extending credit to a purchaser-borrower at a point-of-sale terminal, the method comprising:

> registering by a processor a merchant with a host system operated by or for a lending financial institution;

> receiving by the processor via a terminal operated by or for the registered merchant a request for an installment purchase agreement from a purchaser-borrower, wherein the request is made in the course of a transaction for the purchase of goods or services selected for purchase by the purchaser-borrower from the registered merchant and the installment purchase agreement represents a payment instrument for payment to the registered merchant of a purchase price for the goods or services;

> sending by the processor a request to the terminal operated by or for the registered merchant for financial information from the purchaser-borrower;

> sending by the processor a request to the host system for velocity data;

> receiving by the processor the financial information and the velocity data;

> determining by the processor from the financial information received from the purchaser-borrower whether the credit worthiness of the purchaser-borrower exceeds a first threshold;

> determining by the processor from the velocity data whether a risk factor exceeds a second threshold; and

> authorizing by the processor payment of the registered merchant in full by the lending financial institution for the goods or services elected for purchase by the purchaser-borrower when both the first and second thresholds are exceeded.

(*Id.* at cl. 1.) Claim 1 of the '353 Patent can be broken down into the following steps: (1) receiving a request for financing of a customer's transaction from a merchant; (2) sending and receiving a customer's financial information to determine creditworthiness; (3) sending and receiving data related to a customer's borrowing history to determine risk of default; (4) making a lending decision based on the financial information and risk factors; and (5) authorizing the transaction based on the lending decision.  (*See id.*)

Claim 1 is directed exclusively to the desired result of making lending decisions based on creditworthiness and risk factors, but does not recite how it is achieved. Neither does the

4

specification. Instead, the applicant made clear throughout the specification that the components for carrying out the claimed method are nothing more than generic computing elements. For example, the applicant acknowledged that the claimed steps could be implemented on "electronic hardware, computer software, or combinations of both," and emphasized the "interchangeability of hardware and software" in performing the claimed steps. (*Id.* at 8:20–33.) No specialized configuration or arrangement is required. (*Id.* at 8:3–15 ("[T]he order of the operations may be re-arranged.").) The '353 Patent does not describe any technical impediment in prior art systems to presenting a financial instrument at a point-of-sale terminal, nor does the '353 Patent disclose any technical solution for doing so. Rather, the applicant admitted that there was nothing novel about the claimed hardware and software, as skilled artisans would know how to implement the described functionality. (*Id.*)

Figure 2 shows "a flow diagram illustrating a process by which a financial instrument may be created at a point of sale." (*Id.* at 2:15–17, Fig. 2; *see also id.* at 6:52–7:50.) No details are provided as to how the software "determine[s] whether the purchaser-borrower qualifies for the requested installment purchase instrument." (*Id.* at 7:12–17.) Instead, the credit request is denied "[i]f the purchaser-borrower does not qualify for the requested installment purchase instrument," and the request is authorized "[i]f the purchaser-borrower qualifies for the requested installment purchase instrument." (*Id.* at 7:17–25.) In other words, Figure 2 (and the '353 Patent itself) is merely a basic flowchart of the traditional process for making lending decisions.

## V.    ARGUMENT

### A.    This Case Should Be Dismissed Under Rule 12(b)(6).

Under Federal Rule of Civil Procedure 12(b)(6), a party may move to dismiss a complaint that fails to state a claim upon which relief can be granted. The Court may grant a motion to dismiss if the "[f]actual allegations [are] enough to raise a right to relief above the speculative level . . . on

the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 109 F. Supp. 3d 916, 931 (W.D. Tex. 2015), aff'd, 838 F.3d 1253 (Fed. Cir. 2016). Importantly, "[a] well-pleaded complaint must contain more than mere labels and conclusions." *Id.* Although factual allegations are taken as true, legal conclusions are given no deference—those matters are left for the court to decide. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief [as a matter of law], this basic deficiency should . . . be exposed at the point of minimum expenditure of time and money by the parties and the court." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007) (internal quotations omitted).

Patentability under 35 U.S.C. § 101 is a threshold legal issue. *Bilski*, 561 U.S. at 602. Accordingly, the § 101 inquiry is properly raised at the pleadings stage if it is apparent from the face of the patent that the asserted claims are not directed to eligible subject matter. *See Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 718–19 (Fed. Cir. 2014) (Mayer, J., concurring). In those situations, claim construction is not required to conduct a § 101 analysis. *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687 F.3d 1266, 1273 (Fed. Cir. 2012) ("[W]e perceive no flaw in the notion that claim construction is not an inviolable prerequisite to a validity determination under § 101.").

### B.     The Law of 35 U.S.C. § 101.

Section 101 of the Patent Act sets forth four categories of patentable subject matter: "any new and useful process, machine, manufacture, or composition of matter." 35 U.S.C. § 101. Also, the law recognizes three exceptions to patent eligibility: "laws of nature, physical phenomena, and ***abstract ideas***." *Diamond v. Chakrabarty*, 447 U.S. 303, 309 (1980) (emphasis added).

Abstract ideas are ineligible for patent protection because a monopoly over these ideas would preempt their use in all fields. *See Bilski*, 561 U.S. at 611–12. In other words, "abstract

intellectual concepts are not patentable, as they are the basic tools of scientific and technological work." *Id.* at 653 (quoting *Gottschalk v. Benson*, 409 U.S. 63, 67 (1972)). Hence, the § 101 analysis for abstract ideas requires courts to determine "whether the claims [at issue] focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016). "The abstract idea exception prevents patenting a result where it matters not by what process or machinery the result is accomplished." *Id.* at 1312 (internal quotation omitted). Accordingly, "[c]laims that are so result-focused, so functional, as to effectively cover any solution to an identified problem are frequently held ineligible under section 101." *Affinity Labs of Texas, LLC v. DirecTV, LLC*, 838 F.3d 1253, 1265 (Fed. Cir. 2016) (internal quotation omitted).

Determining whether a patent claim is impermissibly directed to an abstract idea involves two steps. First, the court determines "whether the claims at issue are directed to a patent-ineligible concept." *Alice*, 573 U.S. at 217. Second, if the claim contains an abstract idea, the court evaluates whether there is "an 'inventive concept'—*i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Id.* at 217–18 (internal quotation omitted).

C.    **The Patent-in-Suit Is Invalid Under 35 U.S.C. § 101.**

The Court should dismiss eCredit Solutions' claim regarding the '353 Patent. The claims of the '353 Patent are invalid under 35 U.S.C. § 101 because they fail both prongs of the *Alice* test. Each claim of the asserted patent is directed to the abstract idea of making lending decisions based on creditworthiness and risk factors. And none of the claims contains an "'inventive concept' . . . sufficient to ensure that the patent in practice amounts to ***significantly more*** than a patent upon the ineligible concept itself." *See Alice*, 573 U.S. at 217–18 (emphasis added). Because eCredit

7

Solutions has failed to state a claim upon which relief may be granted, Vyze respectfully requests that the Court grant its motion and dismiss eCredit Solutions' infringement claim with prejudice. FED. R. CIV. P. 12(b)(6).

### 1.    Claim 1 of the '353 Patent is not patent eligible.

In determining patent eligibility under § 101, the Court must first determine whether the claims are directed to an abstract idea. *Alice*, 573 U.S. at 218. Under any plausible reading, the claims of the patent are directed to an unpatentable abstract idea because they claim nothing more than the "longstanding," "routine," and "conventional" concept of making lending decisions based on creditworthiness and risk factors. *See id.* at 218–25; *Bilski*, 561 U.S. at 611.

### (a)    *Alice* Step 1: Claim 1 is directed to the abstract idea of extending financing to a customer.

Claim 1 is directed to the abstract idea of making lending decisions based on creditworthiness and risk factors. ('353 Patent at 1:26–31.) In assessing whether this claim is directed to an abstract idea, the Court begins by analyzing the "focus" of the claim, *i.e.*, its "character as a whole," in order to determine whether the claim is directed to an abstract idea. *SAP Am., Inc. v. InvestPic, LLC*, 898 F.3d 1161, 1167 (Fed. Cir. 2018). For example, the Federal Circuit has explained that this Court should examine the patent's "'claimed advance' to determine whether the claims are directed to an abstract idea." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1303 (Fed. Cir. 2018). "In cases involving software innovations, this inquiry often turns on whether the claims focus on 'the specific asserted improvement in computer capabilities . . . or, instead, on a process that qualifies as an "abstract idea" for which computers are invoked merely as a tool.'" *Id.* (quoting *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335–36 (Fed. Cir. 2016)).

The "focus" of Claim 1 falls squarely within the same fundamental economic practices consistently held patent ineligible by the Supreme Court. In *Bilski*, the Supreme Court held "the

concept of hedging risk and the application of that concept to energy markets . . . not patentable processes because they are attempts to patent abstract ideas." *Bilski*, 561 U.S. at 609. "These claims attempt[ed] to patent the use of the abstract idea of hedging risk in the energy market and then instruct the use of well-known random analysis techniques to help establish some of the inputs into the equation." *Id.* at 612. In *Alice*, the Supreme Court built upon *Bilski* to uphold the patent ineligibility of claims "drawn to the abstract idea of intermediated settlement." *Alice*, 573 U.S. at 218. The Supreme Court held that "[l]ike the risk hedging in *Bilski*, the concept of intermediated settlement is a fundamental economic practice long prevalent in our system of commerce." *Id.* at 219. So too here. Claim 1 recites nothing more than "presenting a financial instrument to a purchaser-borrower at a POS, determining the credit worthiness of the purchaser-borrower, [and] granting or denying the extension of credit." ('353 Patent at 1:26–31.)  These steps are the same type of fundamental economic practices held abstract in *Bilski* and *Alice*.

Consistent with the principles outlined by the Supreme Court, the Federal Circuit has held that the realm of abstract ideas includes "processing an application for financing a purchase." *Credit Acceptance*, 859 F.3d at 1045; *see also id.* at 1056 ("We have found particularly that data processing to facilitate financing is a patent-ineligible abstract concept."). There is "no meaningful distinction between this type of financial industry practice and [the concepts] held to be abstract in *Alice* or . . . in *Bilski*." *Id.* Likewise, there is no meaningful distinction between the claims held abstract in *Credit Acceptance* and the '353 Patent. The claims in *Credit Acceptance* included "obtaining financial information about a customer from a user, combining these two sources of information to create a financing package for each of the inventoried items, and presenting the financing packages to the user." *Id.* at 1045. Although some claims included "additional details about the financing process: for example, . . . the customer information includes an available down

payment amount; [and] the system calculates a credit score for the customer," these details did nothing to alter the basic focus of the claims as "'a fundamental economic practice long prevalent in our system of commerce.'" *Id.* (quoting *Alice*, 573 U.S. at 219). In the same way, Claim 1 recites the fundamental economic practices of "sending" and "receiving" both "financial information from the purchaser-borrower" and details relating to the purchaser-borrowers lending history (*i.e.*, "velocity data"), and then "determining" whether to authorize a financing package for the transaction. ('353 Patent at cl. 1.) Claim 1 therefore falls under the category of patent ineligible abstract ideas. *See, e.g.*, *Bozeman Fin. LLC v. Fed. Reserve Bank of Atlanta*, 955 F.3d 971, 978 (Fed. Cir. 2020) (holding abstract "a method of receiving data from two financial records, storing that data, comparing that data, and displaying the results").

The limitation of "determining" credit worthiness from a customer's financial information does not change the abstract nature of Claim 1. The applicant admits that merchants "typically" obtain a customer's financial information. ('353 Patent at 1:30–34; *see also* 1:16-27 (describing POS sales involving "electronic funds transfer from a purchaser's financial institution to the financial institution of a merchant" and "a credit card transaction" which requires customers to provide financial information to complete the transaction). Claim 1 does not require "financial information" to be anything other than the same information that is typically used to evaluate a borrower's creditworthiness. For example, a customer's social security number may be used "to identify requests from individuals known to the host 102 who have defaulted on previous financing agreements or who may have attempted fraud." (*Id.* at 4:30-34; *see also id.* at 4:35–37 ("[D]river's license numbers may also be acquired in a financing request and used to determined [sic] the creditworthiness of an individual requesting financing.").)

Nor does the limitation of "determining" lending risk based on "velocity data" make Claim 1 any less abstract. The '353 Patent imposes no limitations on what "velocity data" may be other than the traditional factors evaluated by financial institutions to evaluate credit risk. (*Id.* at 5:15–18 ("The host 102 may also review a financing request against velocity criteria, such as the frequency, numeric count of approved borrowings, and cumulative total of combined borrowings per purchaser-borrower record."). Claim 1 therefore recites nothing more than the same fundamental business practices that are ineligible for patent protection. *See, e.g.*, *Bozeman*, 955 F.3d at 978 ("Verifying financial documents to reduce transactional fraud is a fundamental business practice that, without more, is not eligible for patent protection."); *Credit Acceptance*, 859 F.3d at 1054 ("Each of the claims is directed to the abstract idea of processing an application for financing a purchase."); *Solutran, Inc. v. Elavon, Inc.*, 931 F.3d 1161, 1167 (Fed. Cir. 2019), cert. denied, No. 19-1017, 2020 WL 1325880 (U.S. Mar. 23, 2020) ("We conclude that the claims are directed to the abstract idea of crediting a merchant's account as early as possible while electronically processing a check.").

The claimed advance of the '353 Patent is the flexibility in a purchaser's payment options "while providing a merchant payment in full." ('133 Patent at 1:38–41.) But these "problems relate to conventional business practices, as retailers have long sought to provide their customers with convenient, flexible payment options." *Inventor Holdings, LLC v. Bed Bath & Beyond Inc.*, 123 F. Supp. 3d 557, 561 (D. Del. 2015), *aff'd*, 643 F. App'x 1014 (Fed. Cir. 2016). Like the concepts determined to be abstract in *Bilski* and *Alice*, "[t]he desire to credit a merchant's account as soon as possible is an equally long-standing commercial practice." *Solutran*, 931 F.3d at 1167.

The '353 Patent also purports to provide automatic "validat[ion of] the reliability and credit-worthiness of the purchaser-borrower." ('353 Patent at 1:61–2:3.) This claimed automatic

process is a concept, not an invention, and thus ineligible for patent protection. *See, e.g.*, *Credit Acceptance*, 859 F.3d at 1055 ("Our prior cases have made clear that mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology."); *Alice*, 573 U.S. at 225 ("[T]he use of a computer to . . . issue automated instructions . . . [is a] well-understood, routine, conventional activit[y] previously known to the industry.").

Moreover, Claim 1 recites nothing more than an end-result. It does not describe how the desired result—making lending decisions based on creditworthiness and risk factors—is achieved. (*Id.*) Rather, Claim 1 is directed to the idea itself. The functional nature of Claim 1 is similar to that in the claims held ineligible by the Federal Circuit in *Affinity Labs*. In that case, the claims covered a system of providing regional broadcast signals to out-of-region recipients. *Affinity Labs*, 838 F.3d at 1258. Even though the claims referred to some physical components, "such as a cellular telephone, a graphical user interface, and a downloadable application," the Federal Circuit found the patent-in-suit "claim[ed] the ***function*** of wirelessly communicating regional broadcast content to an out-of-region recipient, not a particular way of performing that function." *Id.* (emphasis added).

The same is true here. For example, the applicant admitted that "such financing instruments" as those described in the patent were "typical[]," albeit "separately negotiated."[1] (*See* '353 Patent at 1:41–42.) Neither Claim 1 nor the specification, however, provides any specific means on how to ***achieve*** any other type of financial instrument negotiation. Claim 1 invokes just

---

[1] Moreover, there is no requirement in the '353 Patent that the financing instrument not be "separately negotiated." Indeed, the '353 Patent admits that a customer can "request[] pre-approval of the transaction" from the customer's own device. ('353 Patent at 7:63–8:2.) There is therefore no distinction between the negotiation of the financing instrument described in the patent and the negotiation that the '353 Patent admits was "typical." (*See id.* at 1:41–42.)

three physical components—a point-of-sale terminal, a processor, and a host system—and describes those components only by restating what they can do, without particularity. (*See id.* at cl. 1.) No details are provided either in the claims or the specification as to how the processor sends and receives data from the point-of-sale terminal or the host system, or how the processor determines credit worthiness and lending risk. Nor is any specialized configuration required. (*Id.* at 8:20–33 ("Skilled artisans may implement the described functionality in varying ways for each particular application.").)

As a result, Claim 1 is directed to the abstract idea of a fundamental business practice, and does not contain any specificity that may transform claims from function-dependent (ineligible) to computer-improving (eligible). *See e.g.*, *Apple, Inc. v. Ameranth, Inc.*, 842 F.3d 1229, 1241 (Fed. Cir. 2016) (affirming that the claims were patent-ineligible where "[t]hey do not claim a particular way of programming or designing the software to create menus that have these features, but instead merely claim the resulting systems."); *SAP Am., Inc.*, 898 F.3d at 1167 ("[C]laims focused on 'collecting information, analyzing it, and displaying certain results of the collection and analysis' are directed to an abstract idea.") (internal quotation omitted); *cf. Ancora Techs., Inc. v. HTC Am., Inc.*, 908 F.3d 1343, 1348 (Fed. Cir. 2018), as amended (Nov. 20, 2018) (holding claims patent eligible because they were directed to "a ***non-abstract*** computer-functionality improvement [] done by ***a specific technique*** that departs from earlier approaches to solve ***a specific computer problem***") (emphasis added).

Given that Claim 1 of the '353 Patent fails to recite any specific technology improvement, the claim is critically different from what the Federal Circuit has determined to be patent eligible. For example, in *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356 (Fed. Cir. 2018), rather than using conventional user interface systems, the claims were directed to a

"particular manner of summarizing and presenting information in electronic devices." *Core Wireless*, 880 F.3d at 1362 (finding claims "disclose[d] an improved user interface for electronic devices, particularly those with small screens" and "improve[d] the efficiency of using the electronic device"). Similarly, in *Enfish*, the Federal Circuit found the claims patent eligible because the focus "is on the specific asserted improvement in computer capabilities," rather than "on a process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool." *Enfish*, 822 F.3d at 1335–36. In contrast, the focus of Claim 1 is making lending decisions based on creditworthiness and risk factors—"an improvement in wholly abstract ideas," rather than an improvement "in the way computers and networks carry out their basic functions." *SAP Am. Inc.*, 898 F.3d at 1168.

The focus of the '353 Patent—making lending decisions based on creditworthiness and risk factors—is an abstract idea, not a patent-eligible invention. Accordingly, the Clam 1 fails the first step of the *Alice* test.

### (b)   *Alice* Step 2: Claim 1 does not contain an inventive concept sufficient to confer patent eligibility.

The '353 Patent's independent claims merely apply the applicant's desired concept in a generic technological environment using conventional computer components and functions, and thus do not contain an inventive concept sufficient to confer eligibility.

The Supreme Court is clear that "[t]he mere recitation of a generic computer cannot transform a patent-ineligible abstract idea into a patent-eligible invention." *Alice*, 573 U.S. at 223. For example, in *Credit Acceptance*, the claims invoked "conventional and generic computer components," including "a database, user terminal, and server." *Credit Acceptance*, 859 F.3d at 1056. The Federal Circuit confirmed that "merely 'configur[ing]' generic computers in order to 'supplant and enhance' an otherwise abstract manual process [of securing financing]" was

14

"precisely the sort of invention that the *Alice* Court deemed ineligible for patenting." *Id.* at 1056. Likewise, the specification of the '353 Patent is generic and devoid of any improvement or non-conventional use of basic components.

Other Federal Circuit cases have held similar claims patent ineligible. *See, e.g.*, *Inventor Holdings*, 123 F. Supp. 3d at 561. In *Bozeman*, for example, the claims related to "a method of receiving data from two financial records, storing that data, comparing that data, and displaying the results" to "verify[] financial documents to reduce transaction fraud." *Bozeman*, 955 F.3d at 978. Because the "technological components recited in [the claims] were conventional, off-the-shelf computer components," the Federal Circuit held "the claims do not include an inventive concept that would otherwise render the claims eligible." *Id.* at 980–81; *see also Solutran*, 931 F.3d at 1169 ("Merely using a general-purpose computer and scanner to perform conventional activities in the way they always have, as the claims do here, does not amount to an inventive concept.").

In the same way, Claim 1 of the '353 Patent does not invoke any non-conventional hardware or software. The applicant admitted that point-of-sale terminals were components of "typical" transactions. ('353 Patent at 1:11–48.)  The claimed processor is nothing more than a "general purpose processor" that can be "any conventional processor." (*Id.* at 9:16–34.) And the software is generally any software capable of performing the claimed functions. (*Id.* at 2:45–48 ("The application software 104 includes software executable instructions to enable the host 102 to administer and approve financing requests submitted by a purchaser-borrower as described below.").) Moreover, the patent applicant emphasized that the purported invention was agnostic to whether the steps were implemented in hardware or software. (*Id.* at 8:23–27 ("To clearly illustrate this interchangeability of hardware and software, various illustrative components, blocks,

15

modules, circuits, and steps have been described above generally in terms of their functionality.").) The applicant admitted that a person of ordinary skill in the art would know how to implement the claimed functionality. (*Id.* at 8:30–31 ("Skilled artisans may implement the described functionality in varying ways for each particular application[.]").)

Moreover, the '353 Patent does not specify any improvements to overcome the purported disadvantages of the existing systems and provides nothing inventive to confer patentability. *See In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 613–14 (Fed. Cir. 2016) (holding that the claims were patent ineligible, where the specification described the claims "as either performing basic computer functions such as sending and receiving data, or performing functions 'known' in the art."). And there is simply nothing inventive in these "well-understood, routine, activit[ies]." *Id.* at 613; *see buySAFE, Inc. v. Google, Inc.*, 765 F.3d 1350, 1355 (Fed. Cir. 2014) ("That a computer receives and sends the information over a network—with no further specification—is not even arguably inventive.").

Nor is the ordered combination of steps of Claim 1 sufficient to confer patent eligibility to an otherwise abstract idea. The applicant admitted that the '353 Patent's disclosures were "not intended to require or imply that the steps of the various embodiments must be performed in the order presented," as "the steps in the foregoing embodiments may be performed in any order" and "the order of the operations may be re-arranged." ('353 Patent at 8:3–15.) Claim 1 is therefore merely the recitation of a fundamental business practice devoid of any inventive concept. *See Solutran*, 931 F.3d at 1169 ("Reordering the steps so that account crediting occurs before check scanning (as opposed to the other way around) represents the abstract idea in the claim, making it insufficient to constitute an inventive concept.").

16

Consequently, the Claim 1 recites only generic components—a point-of-sale terminal and a host system—and generic hardware—a general purpose processor. The lending method is no more than a conventional system for facilitating a credit transaction that lacks any inventive concept sufficient to confer patentability under step two of the *Alice* test. *See Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) ("Nothing in the claims, understood in light of the specification, requires anything other than off-the-shelf, conventional computer, network and display technology for gathering, sending, and presenting the desired information.").

### 2. The dependent claims of the '353 Patent are not patent eligible.

The dependent claims of the '353 Patent add additional limitations regarding the abstract idea, but none of them include the specificity necessary to confer patent eligibility. Nor do they include anything other than generic components and processes. *See Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66, 79 (2012) ("Purely 'conventional or obvious' '[pre]-solution activity' is normally not sufficient to transform an unpatentable law of nature into a patent-eligible application of such a law."); *Bilski*, 561 U.S. at 610–11 ("[T]he prohibition against patenting abstract ideas 'cannot be circumvented by attempting to limit the use of the formula to a particular technological environment' or adding 'insignificant postsolution activity.'"). Accordingly, the dependent claims suffer from the same flaws as the independent claims and should also be found patent ineligible.

The dependent claims of the '353 Patent are directed to four groups: (1) the types of information and data used in making the lending decision; (2) fraud prevention; (3) addition of generic computer components; (4) and restricting the technological environment, the merchant, or timing of the financing transaction. As to the first group, Claims 3, 4, and 5 describe that financial information includes "a bank routing/transit number" or "social security number of the purchaser-borrower." Claim 2 describes velocity data as nothing more than a customer's borrowing history,

and claims 5, 6, and 13 describe using that information along with a customer's payment history to make a risk assessment. These claims do not inject any unconventional components or techniques that amount to "significantly more" than the abstract idea. *See Elec. Power Grp.*, 830 F.3d at 1354 ("The advance they purport to make is a process of gathering and analyzing information of a specified content, then displaying the results, and not any particular assertedly inventive technology for performing those functions. They are therefore directed to an abstract idea."); *Solutran*, 931 F.3d at 978 (holding abstract "claims [to] a method of receiving data from two financial records, storing that data, comparing that data, and displaying the results"); *Credit Acceptance*, 859 F.3d at 1045 (holding "claims contain[ing] additional details about the financing process" including specific "customer information" insufficient to transform a the fundamental economic practice of providing financing into a patent eligible concept).

Claims 3 and 4 describe fraud prevention using known validation methods, ('353 Patent at cl. 3; *see also id.* at 4:4–8), or the customer's social security number, (*id.* at cl. 4). But "[v]erifying financial documents to reduce transactional fraud is a fundamental business practice that, without more, is not eligible for patent protection." *Bozeman*, 955 F.3d at 978; *see also Credit Acceptance*, 859 F.3d at 1057 ("Significantly, the claims do not provide details as to any non-conventional software for enhancing the financing process."). Claims 5 and 12 add generic computer components like a "historical data store," ('353 Patent at cl. 5), or generic computers, (*id.* at 12). As discussed above, "[s]imply adding a 'computer aided' limitation to a claim covering an abstract concept, without more, is insufficient to render the claim patent eligible." *Dealertrack, Inc. v. Huber*, 674 F.3d 1315, 1333 (Fed. Cir. 2012).

Claims 7, 11, and 8 relate to pre-authorizing financing, claim 9 restricts the merchant to "brick-and-mortar" or "web-based" merchants, and claim 10 requires that the merchant's services

include "medical services." These limitations merely add token postulation activity that does not make the abstract concept patentable. *See, e.g.*, *Bilski*, 561 U.S. at 612. For example, the pre-authorizing claims are result-oriented and do not specify how the desired results are achieved. *See Intellectual Ventures I LLC v. Capital One Fin. Corp.*, 850 F.3d 1332, 1342 (Fed. Cir. 2017) ("[T]he claim language here provides only a result-oriented solution, with insufficient detail for how a computer accomplishes it. Our law demands more.") (citing *Elec. Power Grp.*, 830 F.3d at 1356). Rather, they simply implement the abstract idea of making lending decisions based on creditworthiness and risk factors with basic computer components. *See BSG Tech*, 899 F.3d at 1290 ("It has been clear since *Alice* that a claimed invention's use of the ineligible concept to which it is directed cannot supply the inventive concept that renders the invention 'significantly more' than that ineligible concept."). Likewise, specifying that a merchant should be "brick-and-mortar" or "web-based" adds nothing to traditional merchants. And implementing the abstract idea in a particular field does not confer patent eligibility to an otherwise abstract idea.

Thus, the dependent claims of the '353 Patent, like the independent claims, fail both steps of the *Alice* test and are invalid under § 101.

### 3.   There are no claim construction or factual disputes preventing the Court from ruling on this issue at the Rule 12 stage.

The issue of the patent eligibility of the '353 Patent is ripe for the Court's consideration. There are no claim construction issues affecting the *Alice* analysis. Additionally, there are no factual disputes on this record. The '353 Patent does not assert any unconventional mechanism of implementing the claimed idea. It claims the desired result of making lending decisions, but goes no further.

This case is thus unlike *Berkheimer v. HP Inc.*, 881 F.3d 1360 (Fed. Cir. 2018), where the Federal Circuit noted that the specification explicitly "describe[d] an inventive feature that store[d]

parsed data in a purportedly unconventional manner." *Berkheimer*, 881 F.3d at 1369. The Federal Circuit then examined whether the improvements described in the specification were included in the claims. *Id.* To the extent that the claims captured those inventive features, the Federal Circuit found a "factual dispute regarding whether the invention describe[d] well-understood, routine, and conventional activities." *Id*. But where the claims did not recite the purportedly inventive features described in the specification, the Federal Circuit concluded that they were directed to patent ineligible subject matter under § 101. *Id.* Here, neither the claims nor the specification describes any unconventional components or the use of generic components in some unconventional way. Although the '353 Patent identifies some limiting factors for the existing systems, such the purported absence of a "financing instrument that establishes a purchaser's obligation to pay for goods and/or services in installments while providing a merchant payment in full," ('353 Patent at 1:38–41), neither the specification nor the claims include any limitations that purport to solve those concerns, such as non-conventional hardware or networks. *See Bilski*, 561 U.S. at 612 ("[L]imiting an abstract idea to one field of use or adding token postsolution components d[oes] not make the concept patentable.").

Accordingly, this issue is ripe for the Court's consideration, and the '353 Patent should be found invalid for failing to claim patent eligible subject matter.

## VI.   CONCLUSION

For the foregoing reasons, Vyze respectfully requests that the Court dismiss eCredit Solutions' patent infringement claim based on the '353 Patent for failure to state a claim upon which relief can be granted. Because leave to amend would be futile, Vyze requests dismissal with prejudice.

Dated: May 14, 2020

**FISH & RICHARDSON P.C.**

By: */s/ Ricardo J. Bonilla*
    Neil J. McNabnay
    mcnabnay@fr.com
    Texas Bar No. 24002583
    Ricardo J. Bonilla
    rbonilla@fr.com
    Texas Bar No. 24082704
    Andria Rae Crisler
    crisler@fr.com
    Texas Bar No. 24093792

**COUNSEL FOR DEFENDANT
VYZE, INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing document has been served on May 14, 2020, to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

*/s/ Ricardo J. Bonilla*
Ricardo J. Bonilla